UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION AT LAFAYETTE

| | |
|---|---|
| BRENDA C. VAN FLEET,            ) | |
|                                      ) | |
|     Plaintiff,                              ) | |
|                                      ) | |
| v.                                              ) | Cause No. 4:05-CV-21 |
|                                      ) | |
| JO ANNE B. BARNHART,               ) | |
| COMMISSIONER OF                     ) | |
| SOCIAL SECURITY,                       ) | |
|                                      ) | |
|     Defendant.                             ) | |

**MEMORANDUM, ORDER, & OPINION**

      Plaintiff, Brenda C. Van Fleet, seeks judicial review of the denial of her claim for benefits and a period of disability under Title II of the Social Security Act. The Commissioner of Social Security found Ms. Van Fleet not entitled to a period of disability nor Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416 (I), 423. This Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g).

      Ms. Van Fleet applied for DIB on June 12, 2001, alleging disability beginning on February 21, 2000 (Tr. 138). The claim was denied on September 11, 2001 (Tr. 15) and the request for reconsideration was denied on January 29, 2002 (Tr. 304-5). Ms. Van Fleet then requested a hearing in front of Administrative Law Judge (the "ALJ") Manuel Cardé, which was conducted on December 16, 2002 (Tr. 15). Ms. Van Fleet was

represented by counsel, and the ALJ heard testimony from several individuals, including medical experts and one vocational expert (Tr. 15, 327). At the hearing, Ms. Van Fleet amended her alleged onset date of disability to May 4, 2001 (Tr. 332-3). The ALJ denied Ms. Van Fleet's application on January 30, 2003 (Tr. 24). The ALJ's decision became final upon the denial of Ms. Van Fleet's request for review on January 21, 2005 (Tr. 5).

## I. Background

Statement of Facts

Ms. Van Fleet was fifty-three years old at the time of the ALJ's decision, had earned a high school diploma, and had completed one year of college courses (Tr. 144). She had also worked as a hair stylist, secretary, and leasing consultant (Tr. 140).

Medical Evidence

Ms. Van Fleet initially visited her primary care physician, Shannon K. Oates, M.D., alleging abdominal pain and other somatic complaints in November of 1993 (Tr. 53). Later, Catherine Hatvani, M.D., noted that her impression of Ms. Van Fleet's condition was that it was consistent with fibromyalgia, along with chronic lymphocytic colitis and hypothyroidism (Tr. 52). In March of 1994, Dr. Hatvani stated in a letter that Ms. Van Fleet was suffering from fibromyalgia disorder (Tr. 93). Dr. Hatvani also noted that the fibromyalgia was augmented by Ms. Van Fleet's depressive disorder and furthermore, that she would need "lengthy rehabilitation before [Ms. Van Fleet] would be able to engage in gainful employment" (Tr. 93).

On March 9, 1994, Ms. Van Fleet had a normal awake and drowsy electroencephalogram ("EEG"), and on November 8 of the same year, Michael Semersheim, M.D., performed an MRI which revealed a small venous angioma, which he characterized as "usually clinically insignificant" (Tr. 192, 278). Again in November of 1994, Ms. Van Fleet was hospitalized for "difficulty with possible seizure," according to Dr. Semersheim (Tr. 91). Dr. Semersheim also opined that he saw "no evidence of any progressive neurologic disorder of any sort" (Tr. 91).

On August 20, 1998, Ms. Van Fleet visited Dr. Oates's nurse practitioner, whose assessment was that Ms. Van Fleet suffered from anxiety and depression (Tr. 44). On November 13, 1999, Ms. Van Fleet had an MRI taken, which indicated very minimal disc bulges in the lower lumbar spine. However, there was no nerve compression (Tr. 227). Dr. Carolyn G. Kochert, M.D., examined Ms. Van Fleet on December 1, 1999 and noted probable lumbar facet disease which was causing the lower back pain, along with possible degenerative disc disease (Tr. 75). On December 29, 1999, Dr. Kochert attempted a lumbar epidural steroid injection but could not complete the treatment because there was excessive pain for Ms. Van Fleet (Tr. 184).

On June 29, 2000, Ms. Van Fleet was examined by Dr. Oates and Julie VanMatre, R.N., M.S.N., C.A.N.P., both of whom stated that Ms. Van Fleet was suffering from left hip and groin tenderness, depression and anxiety, and fibromyalgia (Tr. 227). X-rays taken of the left hip and pelvis were negative (Tr. 230).

3

Ms. Van Fleet was then referred by Dr. Oates to neurologist Theodore A. Nukes, M.D., for Ms. Van Fleet's supposition that she had peripheral neuropathy (Tr. 199). Ms. Van Fleet complained of various ailments, including fibromyalgia and a generalized pain that was "everywhere" (Tr. 199). Ms. Van Fleet had normal strength in her arms and legs (Tr. 199). She complained of excruciating pain upon light palpation in her cervical spine and toes (Tr. 199). Gait and station were normal (Tr. 201). While the symptoms were consistent with peripheral neuropathy, Dr. Nukes noted that there seemed to be "a lot of symptom magnification" on the part of Ms. Van Fleet (Tr. 201). He also assessed fibromyalgia and cervicular radiculopathy, while noting again that "symptom magnification and nonphysiologic findings dominate the clinical picture" (Tr. 201). Dr. Nukes further opined that Ms. Van Fleet may have had peripheral neuropathy but "I do not think that she is disabled" (Tr. 201).

On July 26, 2001, Dr. Nukes referred Ms. Van Fleet to Kelly S. Earnst, Ph.D., a clinical neuropsychologist (Tr. 234-38). Dr. Earnst performed a neuropsychological evaluation in order to assess Ms. Van Fleet's cognitive and emotional functioning (Tr. 234). Ms. Van Fleet denied having any memory problems and generally denied any other cognitive difficulties (Tr. 234). She also disclaimed any suicidal ideation or intent (Tr. 234). Dr. Earnst noted that Ms. Van Fleet was "generally fluent" and was adequately dressed and groomed and that during the testing period, Ms. Van Fleet was "alert and oriented" (Tr. 234).

4

Dr. Earnst's impressions were that Ms. Van Fleet's pain was "exacerbated and maintained by psychological factors" (Tr. 237). Although Ms. Van Fleet had minimal trouble with the area of visuospatial construction, Dr. Earnst noted that her profile was within normal limits (Tr. 237). She recommended that Ms. Van Fleet receive psychotherapy for pain treatment, that her cognitive status should continue to be monitored, and Ms. Van Fleet, since she was found capable of working, should continue to look for employment through Vocational Rehabilitation (Tr. 237).

On August 5, 2001, Ms. Van Fleet complained of foot pain to Dr. Nukes (Tr. 196). Dr. Nukes opined that the testing ordered during Ms. Van Fleet's last visit were all essentially negative (Tr. 196). He noted that symptom magnification was dominating the clinical picture and that if Ms. Van Fleet was suffering from peripheral neuropathy, it was of the "idiopathic, small fiber" variety (Tr. 197). Dr. Nukes concluded that Ms. Van Fleet was not disabled and that "she should get back to work as soon as possible" (Tr. 197).

On September 6, 2001, State Agency psychologist D. Unversaw, Ph.D., reviewed Ms. Van Fleet's medical record. Dr. Unversaw noted that Ms. Van Fleet had no medically determinable mental impairment and cited Dr. Nukes's finding of possible symptom magnification to support his conclusion (Tr. 204, 216).

On October 3, 2001, Ms. Van Fleet was admitted to the Arnett Clinic Urgent Care Center for a spontaneous left pheumothorax (Tr. 158). She was treated by chest tube placement and had quick resolution (Tr. 153). On October 4, 2001, Hamid S. Hamdi,

M.D., noted that his findings were consistent with small fiber polyneuropathy and that Ms. Van Fleet should continue in her pain management consultation in accord with Dr. Oates's wishes (Tr. 154).

On October 5, 2001, Dr. Kochert evaluated Ms. Van Fleet at the request of Dr. Oates, who was reluctant to continue dispensing pain medication to Ms. Van Fleet (Tr. 181). The examination showed tenderness in the left lower lumbar spine along with decreased range of motion in the back (Tr. 181). Her strength appeared to be mildly decreased as well (Tr. 181). Dr. Kochert found peripheral neuropathy, recommended that Ms. Van Fleet continue her treatment with Dr. Hamdi, and prescribed Darvocet, along with increasing her dosage of Neurontin (Tr. 182).

On October 9, 2001, William K. Oliver, III, D.P.M., a podiatrist, examined Ms. Van Fleet, who was complaining of intermittent pain in her toes concurrent with numbness (Tr. 157). Ms. Van Fleet's discrimination between "sharp" and "dull" was diminished, her vibratory sensation was reduced, but her muscle mass and tone were within normal limits (Tr. 157). Dr. Oliver agreed with Dr. Nukes diagnosis of peripheral idiopathic neuropathy and encouraged continued use of the topical therapy (Tr. 157). Dr. Oliver further opined that there was no known cure for Ms. Van Fleet's complaints (Tr. 157).

On October 30, 2001, Dr. Hamdi examined Ms. Van Fleet, again for reports of pain (Tr. 194). He noted that she continued to have symptoms of neuropathy, although

6

the EMG was normal and the tests had been normal except for a slight elevation of her vitamin B6 level (Tr. 194).

On November 5, 2001, Ms. Van Fleet began physical therapy (Tr. 175). Physical therapist Lowell Shaw, P.T., stated that Ms. Van Fleet had several areas of pronounced sensitivity, pain in combination with mild decrease in muscle strength, flexibility, muscle extensibility, and tolerance to physical activity (Tr. 178). He prescribed a two-week course of physical therapy (Tr. 178).

On January 22, 2002, State Agency physician J. Sands, M.D., reviewed Ms. Van Fleet's medical record and affirmed Dr. Dobson's opinion (Tr. 246). On January 24, 2002, State Agency psychologist J. Gange reviewed the record and concurred with Dr. Unversaw's opinion (Tr. 216).

On March 17, 2002, Ms. Van Fleet was evaluated by clinical psychologist David G. Jarmon, Ph.D. (Tr. 70). He noted that her articulation was "adequate" and that her "verbal responses were relevant and coherent" (Tr. 71). She was able to perform two-digit addition, could repeat five digits in the forward direction and three in the reverse direction, and could count backward from twenty to one (Tr. 72). Dr. Jarmon concluded that Ms. Van Fleet had a depressive disorder, not otherwise specified (NOS), and ranked her Global Assessment of Functioning score as 65 (Tr. 72).

On October 2, 2002, Dr. Oates completed a physical capacities evaluation (Tr. 31). She noted that Ms. Van Fleet could sit for a total of one hour, stand for a total of one

7

hour, and could perform no walking during the average eight-hour work day (Tr. 31). Further, Dr. Oates stated that Ms. Van Fleet could only occasionally lift up to ten pounds, could not use her arms or hands or legs or feet for repetitive movements, and could only occasionally bend (Tr. 31). She concluded by noting that Ms. Van Fleet should be restricted from working around unprotected heights, moving machinery, drastic temperature changes, and dust and fumes (Tr. 31).

Plaintiff's Testimony

Ms. Van Fleet estimated that she could sit for about fifteen minutes and stand for ten minutes (Tr. 333). Further, she noted that she was forced to use a walker, which she had left outside of the hearing room (Tr. 334). She stated that she could walk about half of one block and could not lift a bag of potatoes, though she could manage a gallon of milk (Tr. 334). She did not go to church, to the movies, or to visit family and spent the greater part of the day watching television and reading (Tr. 338-9).

Ms. Van Fleet disagreed with Dr. Earnst's assessment that she was, from a cognitive and emotional perspective, able to return to work (Tr. 345-6). She stated that she could not perform a job that even allowed her to sit or stand at will (Tr. 345). She further noted that she thought she had small fiber peripheral neuropathy, which was diagnosed by Dr. Oates (Tr. 346). However, a nerve biopsy has never been taken to corroborate this supposition (Tr. 347). Lastly, she disagreed with Dr. Nukes's assessment that she was magnifying her symptoms and noted that her fibromyalgia, combined with

8

the neuropathy, caused her chronic pain (Tr. 377).

Medical Expert

Emily Geisel, M.D., stated that the EMG was inconclusive as far as substantiating the existence of the small fiber neuropathy (Tr. 350). She also opined that the fibromyalgia limited Ms. Van Fleet to light work (Tr. 363). She also noted that exercise would treat the fibromyalgia and that Ms. Van Fleet was aggravating the problem by not doing so (Tr. 364). Richard Hutson, M.D., agreed with Dr. Geisel's assessment (Tr. 365).

Vocational Expert

Gail Ditmore noted that Ms. Van Fleet could perform any of her three previous jobs if she were limited to light exertional work (Tr. 364-5). Further, she stated that her testimony was not in conflict with the Dictionary of Occupational Titles (Tr. 381).

ALJ's Findings

The findings of the ALJ are as follows:

1. The claimant met the disability insured status requirements of the Social Security Act and regulations on February 21, 2000.

2. The claimant engaged in substantial gainful activity from October 1, 2000, to December 31, 2000, and from January 22, 2001, through May 3, 2001 (20 CFR § 404.1574 (b)).

3. The claimant has medically determinable impairments of fibromyalgia and possible peripheral neuropathy, with normal electromyograms. The impairments

9

of hypothyroidism, a seizure disorder, a hearing loss, low back pain, and a depressive disorder are not medically determinable impairments (20 CFR § 404.1520(b)).

4. The severity of the claimant's impairments, singly or in combination, does not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulations No. 4.

5. The claimant's testimony was not credible to the extent that it may be interpreted to mean that she has pain and/or other functional limitations so severe that she cannot work.

6. The claimant has the residual functional capacity for the full range of light work.

7. The claimant's past relevant work as hair stylist, secretary, and leasing agent did not require the performance of work-related activities precluded by her residual functional capacity (20 CFR § 404.1565).

8. The claimant's medically determinable impairments do not prevent her from performing her past relevant work as hair stylist, secretary, and leasing agent.

9. The claimant was not under a disability as defined in the Social Security Act, at any time through the date of the decision (20 CFR § 404.1520(e)).

## The ALJ's Decision

Based on the application filed on June 12, 2000, the ALJ found that "the claimant is not entitled to a period of disability or disability insurance benefits, under Sections

216(j) and 223, respectively, of the Social Security Act" (Tr. 23-24).

## II. Standard of Review

This court's review of the Commissioner's decision is a limited one. Unless there is an error of law, the court will uphold the Commissioner's findings of fact if they are supported by substantial evidence. *Schoenfeld v. Apfel,* 237 F.3d 788, 792 (7th Cir. 2001). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971). In making a substantial evidence determination, the court will review the record as a whole, but will not reevaluate the facts, re-weigh the evidence or substitute its own judgment for that of the Commissioner. *Williams v. Apfel,* 179 F.3d 1066, 1071-72 (7th Cir. 1999). That being said, the ALJ must "build an accurate and logical bridge between the evidence and the result." *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000). *See also, Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995).

With respect to credibility determinations, the ALJ is in the best position to observe the demeanor and veracity of the testifying witnesses. *Clifford v. Apfel,* 227 F.3d 863, 872 (7th Cir. 2000). The court will not disturb the ALJ's weighing of credibility so long as those determinations are based on some support in the record and are not "patently wrong." *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006) (citing *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). However, the district court is required to critically review the evidence and not simply rubber-stamp the

11

Commissioner's decision.  *Clifford*, 227 F.3d at 869.

### III.  Discussion

"Benefits are available only to those individuals who can establish disability under the terms of the Social Security Act."  *Estok v. Apfel*, 152 F.3d 636, 638 (7th.Cir.1998).  Under section 423(c)(1)(B)(1), it is well established that to receive benefits, a disability must have begun or had its inception during the period of insured status.  *Bolinger v. Barnhart,* 446 F. Supp. 2d 950, 954 (N.D. Ind. 2006) (citing *Bastian v. Schweiker*, 712 F.2d 1278, 1280 (8th Cir. 1983).  A claimant has the burden of establishing that she is disabled within the meaning of the Social Security Act on or before the date her insured status expired.  *Estok*, 152 F.3d at 640; *Meredith v. Bowen*, 833 F.2d 650 (7th Cir.1987); *Owens v. Heckler*, 770 F.2d 1276, 1280 (5th Cir.1985); *Garner v. Heckler*, 745 F.2d 383, 390 (6th Cir.1984); *Jeralds v. Richardson*, 445 F.2d 36, 39 (7th Cir.1971). "The law requires that a claimant demonstrate her disability within the proscribed period of eligibility not prior to or subsequent to the dates in question." *Jeralds,* 445 F.2d at 39. Therefore, "any condition that had its onset or became disabling after plaintiff's insured status expired may not be used as a basis for entitlement to disability benefits." *Couch v. Schweiker*, 555 F.Supp. 651, 654 (N.D. Ind.1982).  Plaintiff  bears the burden of showing through testimony and medical evidence supported by clinical data and laboratory diagnosis that she was disabled during the period in which she was insured.  *Reading v. Matthews*, 542 F.2d 993, 997 (7th Cir.1976) *(citing, Jeralds,* 445 F.2d at 38-39).

The claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The regulations to the Act create a five-step inquiry in determining whether a claimant is disabled. As previously discussed, the ALJ must consider the applicant's claim in the following sequence:

> (1) whether the claimant is currently employed; (2) whether she has a severe impairment; (3) whether her impairment meets or equals one listed by the Secretary; (4) whether the claimant can perform his past work; and (5) whether the claimant is capable of performing any work in the national economy.

*Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001) (citing 20 C.F.R. § 404.1520*)*. The initial burden in steps one through four is on the plaintiff; only at step five does the burden shift to the Commissioner. *Bolinger*, 446 F. Supp. 2d at 955.

Ms. Van Fleet first asserts that the ALJ's determination of her residual functional capacity was not supported by substantial evidence because the ALJ "largely ignored" the opinion of Dr. Earnst without providing any reasons for doing so. Pl. Br. at 21. Ms. Van Fleet implies that the pain disorder, which was diagnosed by Dr. Earnst, coupled with psychological factors should be characterized as severe. Pl. Br. at 21. However, during the course of his opinion, the ALJ referred to Dr. Earnst's findings that Ms. Van Fleet was able to work (Tr. 18). This demonstrates that the ALJ was very aware of Dr. Earnst's opinion and had taken account of it in his decision making. Thus, even though there was

13

no explicit mentioning of the exact weight given to Dr. Earnst's opinion, it is clear that Dr. Earnst's diagnosis was taken into account.

Next, Ms. Van Fleet asserts that the ALJ was in error for not giving a substantial amount of weight to Dr. Earnst's diagnosis of pain disorder.  Pl. Br. at 24.  Ms. Van Fleet apparently believes the pain disorder diagnosis supports a finding of disability.  Again, however, it must be noted that Dr. Earnst stated that Ms. Van Fleet was able to return to work (Tr. 237).  This assessment made by Dr. Earnst was concurred in by several other medical practitioners who had the opportunity to examine Ms. Van Fleet.

Indeed, Dr. Nukes, Ms. Van Fleet's treating neurologist, stated that while there were symptoms of peripheral neuropathy, it was Ms. Van Fleet's symptom magnification which "dominated the clinical picture" (Tr. 201).  After the pain disorder diagnosis by Dr. Earnst, Dr. Nukes evaluated Ms. Van Fleet again and stated that she "should go back to work as soon as possible" (Tr. 197).  Thus, Dr. Nukes was aware of Dr. Earnst's opinion and still maintained that Ms. Van Fleet was not disabled and should return to work, making the knowledge of the pain disorder diagnosis implicit in his rationale.  *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)(noting that, even though the ALJ does not explicitly consider some factors, they are "factored indirectly into the ALJ's decision as part of the doctor's opinions.")

Beyond that, the belief that Ms. Van Fleet was capable of working was further substantiated by Drs. Geisel and Hutson, the medical experts on hand at the

14

administrative hearing (Tr. 363-5), along with the State Agency physicians, who had reviewed Ms. Van Fleet's record before the hearing (Tr. 240, 246).  All of them agreed that Ms. Van Fleet was capable of performing light work; the ALJ joined in their assessment, relying on their opinion in drafting his decision (Tr. 23).  *See Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004)("It is appropriate for an ALJ to rely on the opinions of [state agency] physicians and psychologists who are also experts in social security disability evaluation.")

Third, Ms. Van Fleet claims that Dr. Earnst's opinion supports her allegations of crippling pain.  Pl. Br. at 24.  However, as noted above, Dr. Earnst believed that Ms. Van Fleet was capable of returning to work.  Furthermore, assuming that the diagnosis was favorable to Ms. Van Fleet, she does not provide a rationale as to how Dr. Earnst's diagnosis would counteract the weight of the evidence against her allegation of disability.  Indeed, Ms. Van Fleet, herself, testified that she was able to perform daily activities.  Tr. 21.  Thus, Ms. Van Fleet's testimony, along with the evidence from the State Agency physicians and Dr. Nukes, bolsters the conclusion that Ms. Van Fleet was not disabled and was capable of performing daily activities.  (Tr. 21).  *See Sienkiewicz v. Barnhart*, 409 F. 3d 798, 804 (7th Cir. 2005); *Powers v. Apfel*, 207 F.3d 431, 435-36 (7th Cir. 2000).  Further, when she had been terminated from her last job, she collected unemployment compensation, which requires the collector to look for employment.  *See Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005)(the "claimant's decision to apply for

15

unemployment benefits and represent to state authorities and prospective employers that he is able...to work" can play a role in assessing the claimant's complaints of disability).

Lastly, Ms. Van Fleet states that while Dr. Earnst did say that she should return to work, "she [did] not say when." Pl. R. Br. at 2. Ms. Van Fleet takes this as a signal that she was merely meant to continue engaging with Vocational Rehabilitation, not actually seek employment. However, Dr. Earnst noted that Ms. Van Fleet was "capable of returning to work," a strong statement that does not appear to be qualified by the encouragement to continue to work with Vocational Rehabilitation; the latter is merely a vehicle to help Ms. Van Fleet return to gainful employment, not a qualification on her ability to work. Thus, while Ms. Van Fleet states that if she were truly capable of working she would not need Vocational Rehabilitation, that is precisely what it means: if she were incapable of working, working with Vocational Rehabilitation to attain employment would be a blatant waste of time for both her and the vocational services.

Therefore, the ALJ's residual functional capacity ("RFC") determination was supported by substantial evidence. Further, because the RFC determination was well-supported, the finding that Ms. Van Fleet was able to perform her relevant previous work was also well-substantiated.

## IV. Conclusion

Again, it must be noted that the review in these matters is of a distinctly limited nature. Therefore, even though an ALJ's determination might not seem to be pregnant

16

with solomonic wisdom in the Plaintiff's eyes, it need only be supported by "relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. 399-400 (1971).  Therefore, because the ALJ's findings were supported by substantial evidence, this Court must **AFFIRM** the ALJ's decision.

**SO ORDERED**.

Date: March     1    , 2007

>     S/ Allen Sharp
> **ALLEN SHARP, JUDGE**
> **UNITED STATES DISTRICT COURT**